1

2

3

4

5        **UNITED STATES DISTRICT COURT**

6        **EASTERN DISTRICT OF CALIFORNIA**

7

8    **JESUS MAYA,**                          CASE NO. 1:12-CV-1479 AWI GSA

9                  **Plaintiff**              **ORDER RE: MOTION FOR SUMMARY JUDGEMNT**

10             **v.**

11   **LEPRINO FOODS COMPANY, a**
     **Colorado corporation, and DOES 1-20,**

12   **inclusive,**

13                  **Defendants**

14                          **I. History**

15          Plaintiff Jesus Maya became an employee of Defendant Leprino Foods at a cheese

16   processing facility in Lemoore, California in August 2009.  Plaintiff took medical leave from

17   April 2010 to June 2010.  Plaintiff joined the California Army National Guard in June 2010.  He

18   took part in occasional weekend or weeklong military training for which he was granted military

19   leave by Defendant.  Plaintiff was called up to active duty and took a longer period of military

20   leave from October 2010 until August 2011.  While Plaintiff was away on active military leave,

21   his wife gave birth to their first child in May 2011.

22          A few months after his return, Plaintiff was sent home in December 2011 for missing

23   work.  Plaintiff disputes that he should have been sent home as Defendant's system for calculating

24   absences was improperly applied due to his taking care of his sick child and his military leave.

25   Defendant reinstated Plaintiff after a week.  Plaintiff inquired as to whether he could take baby-

26   bonding leave in April 2012.  He was told that he was not eligible as he had not worked enough

27   hours in the prior year.  Plaintiff retained counsel, who contacted Defendant on his behalf in April

28   2012.  Defendant offered Plaintiff baby-bonding leave in August 2012.

1       Plaintiff brought suit on September 7, 2012.  He alleges that Defendant (causes of action 1

2 and 2) retaliated against him for taking military leave in violation of the Uniformed Services

3 Employment and Reemployment Rights Act ("USERRA") and Cal. Mil. & Vet. Code § 394; (3)

4 retaliated against him for exercising his right to kin care leave; (4) violated medical leave laws;

5 and (5) wrongfully terminated him. Doc. 2, Complaint.  Defendant has now made a motion for

6 summary judgment on all claims. Doc. 15.  Plaintiff opposes the motion. Doc. 16.  The matter was

7 taken under submission without oral argument.

8

9                         **II. Legal Standard**

10       Summary judgment is appropriate when it is demonstrated that there exists no genuine

11 issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

12 Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

13 American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

14 judgment bears the initial burden of informing the court of the basis for its motion and of

15 identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an

16 absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

17 Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

18 might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby,

19 Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

20 Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

21 sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson v.

22 Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Long v. County of Los Angeles, 442 F.3d 1178,

23 1185 (9th Cir. 2006).

24       Where the moving party will have the burden of proof on an issue at trial, the movant must

25 affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

26 Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-moving

27 party will have the burden of proof on an issue at trial, the movant may prevail by presenting

28 evidence that negates an essential element of the non-moving party's claim or by merely pointing

out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated ...by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.

See <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003).  If the non-moving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies</u>, 210 F.3d 1099, 1103 (9th Cir. 2000).

**III. Statements of Material Fact**

**A. Joint Statement**

1. Plaintiff Jesus Maya ("Plaintiff") is a current employee of Leprino Foods Company ("Leprino").

2. Plaintiff was hired by Leprino to work at the Lemoore West facility in August 2009, and began working as a break relief operator on "Cheese Line 3," shortly thereafter.

3. The break relief operator position operates equipment in place of other hourly employees while the other employees are taking meal and rest breaks.

4. Plaintiff joined the California Army National Guard in June 2010 and served as an IT Specialist.

5. Leprino provided Plaintiff with reemployment in the same position with the same duties each time he returned from military obligations.

6. Plaintiff has requested and been granted "kin care" leave pursuant to California Labor Code Section 233, which allowed him to use his accrued sick leave to take care of sick family members.

7. Plaintiff was not provided "kin care" leave when he did not have enough accrued sick leave to cover the absence.

8. Leprino's Lemoore West facility maintains a no-fault Attendance and Tardiness Policy, which utilizes a point system under which an employee receives attendance points for being absent, tardy, and/or for failing to call in an absence on time.

9. If an employee at Lemoore West accumulates seven attendance points in a rolling 12-month period, he or she is subject to termination under the Attendance and Tardiness Policy.

10. On March 20, 2012 and April 10, 2012 Plaintiff inquired with Leprino's HR Department about whether he was eligible for FMLA baby-bonding leave. The HR Department advised Plaintiff that he had not met the minimum requirement of having worked 1,250 hours in the past 12 months to be eligible for FMLA leave.

**B. Defendant's Separate Statement**

1. Plaintiff's primary drill and training obligations with the Army included a requirement to report for duty one weekend per month and to attend a two-week annual training once a year, and he has reported on other occasions as well.

    Disputed

2. Leprino granted Plaintiff time off from work pursuant to its obligations under USERRA for every instance of military leave for which Plaintiff provided notice, including short term and extended leaves of absences to attend monthly weekend drills, annual training, and a 10-month leave for Plaintiff to attend basic training.

    Undisputed

3. Plaintiff requested and took family leave to care for his spouse and his newborn child from November 21, 2012 to January 16, 2013.

    Disputed

4. The Attendance and Tardiness Policy provides that attendance points are not assessed for legally-protected absences such as absences for military obligations, absences under the Family Medical Leave Act ("FMLA") or California Family Rights Act ("CFRA"), and absences for kin care under Labor Code Section 233.

    Disputed

5. Plaintiff was never suspended without pay, demoted or discharged as a result of accumulating attendance points.

    Disputed

6. Plaintiff was never disciplined for accumulation of attendance points at any level above a warning.

    Disputed

7. After Plaintiff returned to Leprino from an extended military leave to attend basic training, the Human Resources ("HR") Department readjusted Plaintiff's attendance points so that military service would be treated as time worked for purposes of calculating the 12-month rolling period in which attendance points accumulate.

    Disputed

8. In December 2011, Plaintiff was placed on administrative leave from work when his attendance points appeared to reach the level for termination.

    Disputed

9. Prior to being placed on administrative leave, Plaintiff had been advised by the HR Department that he had zero points, so after an investigation, Leprino returned Plaintiff to work with payment for the time off, and did not terminate him.

    Disputed

10. In August 2012 the HR Department realized that it had made a mistake in advising Plaintiff that he had not worked enough hours to be eligible for FMLA leave and that under USERRA it should have counted Plaintiff's time off for military leave as hours worked for purposes of determining eligibility under the FMLA.

Disputed

11. On August 30, 2012, Leprino offered Plaintiff the opportunity to take up to 12 weeks of leave for baby bonding at any time within six months of August 30, 2012, and offered to pay Plaintiff he partial pay that he would have received from the state had he taken baby-bonding leave in April 2012.

Disputed

12. Plaintiff chose not to take the baby-bonding leave that Leprino offered him on August 30, 2012.

Disputed

13. Leprino provides notice of an employee's right to request CFRA or FMLA through its LOA policy, employee handbook, and postings in the facility.

Disputed

**C. Plaintiff's Separate Statement**

1. Plaintiff started attending military drill weekends in June 2010, took extended military leave from October 2010 until early August 2011, and then attended drills and annual training again after that.  He provided his managers and supervisors with the schedule for the whole year.  He has also been required to report for duty on about a dozen occasions that are not on the schedule.

Undisputed

2. Sr Supervisor Walker admitted, in deposition, that she knew Plaintiff joined the military and took extended military leave, and took time off for drill weekends.

    Undisputed

3. Manager Lucas knew that Plaintiff took military leave because he asked HR if he could replace Plaintiff because his military leave would last longer than 12 weeks.  HR Rep Whitendale knew that Plaintiff took military leave too because she told Lucas that he could not do this.

    Disputed

4. HR Mgr Anderson knew that Plaintiff took military leave because HR Manager Mattos warned him about terminating Plaintiff so close to him returning from a military deployment.

    Disputed

5. HR Mgr Mattos admitted, in deposition, that she knew Plaintiff was in the military leave because he requested extended military leave.

    Undisputed

6. HR Administrator Caggiano knew Plaintiff took military leave because Mgr Lucas advised her of his 10 month deployment when they discussed terminating him.

    Disputed

7. VP / GM Tuttrup knew that Plaintiff took military leave because he was involved in discussions about terminating Plaintiff and asked to see a summary of Plaintiff's attendance points that would have expired automatically if had remained continuously employed and not taken military leave.

    Disputed

8. Supervisor Huff admitted that he knew Plaintiff joined the military, took extended military leave, and leave for drill weekends.

Undisputed

9. HR Mgr Mattos admitted, in deposition, that she exchanged email with Mgr Lucas on or about November 15, 2011, which reveals his thwarted plan to replace Plaintiff permanently.

Mgr Lucas asked:

> Ana,
> I would like to know how we handle different types of leave. Jesus was out a few weeks when he had some medical problems this summer. He is currently in the middle of boot camp or training school for the National Guard.
> Do these events both count against his 12 weeks of leave? I would like to see how much time he's missed this year and get some direction on how to handle this individual.

HR Mgr Mattos responded:

> The medical reason yes, but the military reason no. If an employee goes on military leave their jobs are reserved for them until they return, no matter how long they are serving.
> So there is nothing further that we can do while he is on leave. We have to wait for his return.

Mr. Lucas responded:

> Nice ... I replaced David too .. so now I don't need the Schelprock from processing ... When I asked about this in July trying to plan for coverage I was told to replace him.

Disputed

10. HR Mgr Anderson admitted, in deposition, that Plaintiff's supervisors asking him to keep track of Plaintiff's leave, and have Plaintiff bring in paperwork supporting his need for military leave sooner because they "don't like people to come and go on leave and not have paperwork . . . ."

Disputed

11. Sr Supervisor Walker admitted, in deposition, that many times the only way to cover an employee absence due to military leave is with a 12 hour overtime shift because vacation and other relief personnel are not available for that purpose.  She has to do this for four employees.

Disputed

12. Sr Supervisor Walker admitted, in deposition, that she sometimes learns that her four employees need to take military leave after the schedule has been posted.  In such cases, she has to order people to work 12 hour shifts on overtime or take them off a job where they were scheduled to work.  She claimed the employees have never told her how they feel about this.

Undisputed

13. Sr Supervisor Walker admitted, in deposition, that she has complained about having to make changes to the schedule and find coverage because an employee took military leave.  She admitted voicing her frustration about this to other supervisors.

Disputed

14. Sr Supervisor Walker admitted, in deposition, that she has created problems for employees needing time off for drill weekend by posting schedules that require them to work on drill weekends even though they gave her copies of drill orders before the schedule was made.  She was frustrated in such instances because she had to tell employees that their schedules would change.

Disputed

15. Sr Supervisor Walker first denied, in deposition, being part of any communication wherein supervisors or managers expressed frustration with people taking military leave and having to find coverage.  However, this was not true.

Disputed

16. HR Mgr Mattos admitted, in deposition, that, according to typical company policy, practice and procedure, managers are not supposed to call employees names or make fun of them because the employee took military leave.  They should not do these things behind closed doors either.

Disputed

17. Supervisor Holliday told Mgr Lucas that he knew Plaintiff "leaves for reserves or guard in October . . . maybe we should give him a going away present" just because Plaintiff missed work.

Dsiputed

18. Mgr Lucas wrote an email demanding to know why Plaintiff was off work on a Sunday.  He wrote: "before I get pissed off, I want to know the details."  Anne Green wrote back and told him Plaintiff was off due to "Military Duty."  Supervisors Huff and German were included in this exchange.  Huff admitted that Plaintiff's drill weekends was suppose to be put on the schedule and this failure has happened on other occasions so that other email like this is necessary.

Disputed

19. Sr Supervisor Walker admitted, in deposition,  that Supervisor German went out of his way to make sure that Plaintiff's days off did not rotate normally because he had 7 attendance points that would have fallen off automatically had Plaintiff not taken military leave and remained continuously employed.  German also implied that Plaintiff had more than his share of weekends off since being back from military leave, most likely due to drill weekends.  Walker admitted that German should not have done this and that the points should not have been considered.  She admitted this was definitely out of the norm.  She admitted that Mr. Maya could not give himself any weekends off and was not responsible for the schedule.  Supervisors Huff and Cox were part of this email exchange.  Huff claimed he was not involved and admitted that German was not supposed to do this.

Disputed

20. Sr Supervisor Walker claimed, in deposition, that she never considered Plaintiff's military leave as vacations or time off, and claimed that she understood that he had to go to work at drill weekends.  However, she was lying.  She  wrote an email to Mgr Lucas on June 8, 2012, wherein she wrote a snippy comment calling drill weekends "mini vacations.  The email string started with a supervisor asking HR whether she could delay the time for some of Plaintiff's attendance points

to automatically fall off because a two-day drill weekend ended up being a four-day drill weekend. When told not to delay the automatic process of points dropping off, Walker wrote: **"Interesting . . . so these mini vacations he gets don't affect the date on his LOA."**

Disputed

21. HR Mgr Anderson also admitted that making derogatory comments about employees taking protected leaves was inappropriate.  However, when shown the comment made by Sr Supervisor Walker about drill weekends being "mini vacations" and asked if this would be a violation of company policy he said "Derogatory would have to be interpreted, so we'd have to decide what does derogatory mean."

Disputed

22. Sr Supervisor Walker admitted, in deposition, that she exchanged email with Mr Lucas and other supervisors (Huff, Young, Castillo, Owens) wherein they wrote:

> **This is ridiculous. Is it me, or Is this guy ALWAYS "have a drill"?! .....
> Conveniently on a scheduled 12 no less.** How can we properly manage a line if
> we never have consistency with our employees? **How is it fair to anyone else that
> they're continuously having to cover 12s on weekends because this guy is "on a
> drill"?** There HAS to be something we can do to remove him from this vital
> position and move him to another job ..... what recourse do we have
> Russ/Kathleen? Or is this just another "we can't do anything, this is how the
> system works" type of deal?

Huff and Castillo admitted they were involved in this too.

Undisputed

23. Sr Supervisor Walker admitted, in deposition, that Mgr Lucas sent her an email asking if she saw  the part of the  Military Orders that says "we don't have to pay for weekend drill . . . I think" and called this verbiage "legal mumbo jumbo." She told Lucas that Plaintiff can use vacation and the company does not pay.  She did know why he was concerned about it.

Disputed

24. Sr Supervisor Walker admitted, in deposition, that she wrote emails to Mgr Lucas and HR in June 2012 asking if something could be done about Plaintiff taking military leave on short notice because she was frustrated.  She admitted that her frustration was with the military itself, not Plaintiff.  She never thought Plaintiff was holding on to his orders for too long and springing them on her at the last minute.

    Undisputed

25. Sr Supervisor Walker admitted, in deposition, that she exchanged email with a supervisor on July 12, 2012, who asked why Plaintiff's time card had no entries for a day that he was scheduled to work.  Walker told him Plaintiff was at drill.  The supervisor wrote: "Of course he was at drill :-)" Walker admitted that this comment was inappropriate.

    Disputed

26. Supervisor Castillo admitted, in deposition, that he was part of email exchanges where managers and supervisors Lucas, Walker, Wooten, Holliday, Huff, You and Walker "were complaining about Jesus for taking military leave."

    Disputed

27. Supervisor Castillo admitted, in deposition, that he was part of conversations where managers and supervisors Lucas, Walker, Wooten, Holliday, Huff, You and Walker were complaining about Plaintiff "being absent, because he was on drill weekend. . . ."

    Disputed

28. Supervisor Huff admitted having conversations with people who worked with Plaintiff wherein people were expressing frustration with Maya taking military leave.

    Disputed

29. Supervisor Huff first denied that Plaintiff's military leave caused him any difficulty.  Then,

when presented with email that he wrote, Huff admitted that Plaintiff's military leave caused him

difficulty.

Disputed


30. Supervisor Huff lied in deposition and denied exchanging email with Mgr Lucas, Sr

Supervisor Walker and other supervisors wherein they expressed frustration about Plaintiff taking

military leave.

Disputed


31. Supervisor Huff tried to get Plaintiff in trouble and complained to Mgr Lucas and Sr

Supervisor Walker that Plaintiff spent 4 hours in HR.  He wanted to write Plaintiff up for

performance because of this.

Disputed


32. Supervisors Green, Cox, Holliday, and Huff and Mgr Lucas exchanged email wherein Green

said she may need support because she wanted "an OFFICIAL document" saying Plaintiff had

military drills.

Disputed


33. After Plaintiff started going to military drills, Supervisor Holliday sent an email to Mgr Lucas

and Supervisors Huff, German and Green saying "I would strongly recommend that we walk him

out when he returns to work."  Huff lied in deposition and said he did not know what this meant

and would not say whether it meant to fire Plaintiff.

Disputed


34. Lucas accused Plaintiff of lying and "getting out of hand."

Disputed

35. VP Tuttrup was very cavalier in saying he did not know if the supervisors violated any

company by writing the email messages mentioned above.  He refused to say whether he had a

problem with the supervisors making such comments.

     Disputed


36. Leprino has terminated another service member, Manny Sanchez, for violation of the

attendance policy.

     Disputed


37. HR Mgr Mattos admitted, in deposition, that attendance points automatically "drop off" or "go

away" after the absence, according to Leprino's Attendance Policy.

     Disputed


38. HR Mgr Anderson admitted, in deposition, that Leprino had a written military leave policy in

December 2011 that states:

> **E. Benefits:**
> Employees will receive credited service and other seniority-based rights (and any
> other rights and benefits in accordance with USERRA) for the time spent on
> military leave, if he or she returns to work upon release from military duty within
> the time limitations and requirements of USERRA. Employees do not accrue
> vacation and sick time if their military leave extends beyond five (5) days.
> However, if an employee would have moved. to a different accrual scredute for
> vacation time while on leave (e.g. 2 weeks to 3 weeks) then the employee will
> move to the new accrual schedule immediately upon return to work. . . .

     Undisputed


39. HR Mgr Mattos admitted, in deposition, that, despite the passage in the Military Leave Policy

about seniority-based benefits, she did not know, in December 2011, that attendance points were

supposed to drop off automatically just as if the employee had not taken military leave and

remained continuously employed.

     Disputed

1   40. HR Mgr Mattos claimed that Plaintiff's attendance points reached a level warranting

2   termination under Leprino's Attendance Policy just before Christmas 2011, but he had not worked

3   at Leprino for more than a year because he was on military leave the whole time.

4        Disputed

5

6   41. HR Mgr Mattos admitted, in deposition, that, in December 2011, Plaintiff told her that

7   termination was not warranted because he had taken military leave for a year and should have zero

8   points.  He said that an HR representative told him that he had zero points.

9        Disputed

10

11  42. HR Mgr Mattos admitted, in deposition, that she exchanged email with HR Mgr Anderson that

12  show Plaintiff told them he should have zero attendance points in December 2011 before the

13  termination.  On 12/1/11, HR Rep Caggiano wrote:

14       When he called for his points a week or two ago he didn't actually speak with me.
         He called Lindsay; she asked me to look up the points, which I did and she got
15       back on the phone and told him 0. So, I have reviewed the points and 11/29/11 puts
         him at 7. He came in at about 2:50 p.m. today and asked me how many points he
16       has and I told him 'you have 7 points'. He said 'I was told I have zero.' I said
         'when you called and asked about your points, did you at any time say that you
17       have been on LOA? He said 'no'.

18       Disputed

19

20  43. HR Mgr Mattos admitted, in deposition, that the HR department created an Excel spreadsheet

21  showing that, in December 2011 when Plaintiff was terminated, Leprino refused to remove

22  attendance points that would have fallen off automatically had Plaintiff not taken military leave

23  and remained continuously employed.

24       Disputed

25

26  44. Sr Supervisor Walker admitted, in deposition, that, as of June 8, 2012, she asked HR to extend

27  the time to remove attendance points that would have fallen off automatically had Plaintiff not

28  taken military leave and remained continuously employed.

Disputed

45. Leprino's Attendance Policy states:

**Attendance Incentive:**
Any employee, who works six (6) months with no Absence Policy points, will earn an incentive point. Each employee is eligible to accumulate up to two (2) attendance incentive points per rolling twelve month period, exclusive of any approved leave of absence, such as Personal Leave, Medical/Disability, Medical Disability Leave (Workers Military Leave, FMLA Leave.or layoff.

Undisputed

46. Maya was never given any incentive points that he would have automatically earned but for military leave.

Disputed

47. HR Mgr Mattos admitted, in deposition, that she reviewed Plaintiff's file in December 2011, confirmed that his point level warranted termination, and then talked to Plant Mgr Tuttrup, HR Mgr Anderson and Plaintiff's Mgr Lucas.

Disputed

48. Plaintiff testified in deposition that he was told by HR and his manger that he had enough attendance points for termination, Mgr Lucas walked him out of the plant, he left the company premises, and did not hear from anyone at Leprino until a week later.

Disputed

49. Plant Mgr Leitner admitted, in deposition, that Plaintiff "was terminated and then reinstated." He said "the termination decision was reversed" and Plaintiff was allowed to return to work because his "points were not calculated correctly" in that they "did not total up to his discharge."

Disputed

17

50. Plaintiff's supervisor Bon Holliday thought Plaintiff was terminated and asked HR Mgr if he was coming back.  It does not matter that Plaintiff was reinstated.  He suffered the "stigma of unpaid administrative leave" because all of his supervisors were copied on the email sent by Holliday asking if Plaintiff was coming back.

     Disputed

51. Sr Supervisor Walker admitted, in deposition, that Plaintiff was not allowed to work because of his points.

     Disputed

52. HR Mgr Mattos admitted, in deposition, that Plaintiff was sent home after he told her he should have zero points.  She claims that he was on admin leave without pay pending termination, but admitted he was not allowed to work.

     Disputed

53. Contrary to her claim that Plaintiff was only on administrative leave, HR Mgr Mattos admitted, in deposition, that she exchanged email with Mgr Lucas and HR Mgr Anderson, wherein she expressed concern about terminating Plaintiff so soon after his return from military leave.

On 11/29/11, Supervisor Cox wrote:

     Jesus called in Kincare last night for his son.  Kronos shows he does not have the sick hours.

On 11/30/11, Mgr Lucas wrote:

     Please update me on his status.  As far as I know, he's way up there on points, with his absence this year for military leave, I don't think anything is falling off.

On 11/30/11, Mgr Lucas wrote:

     . . . I addressed this with him and told me he was informed by [HR Reps] Lindsay [Whitendale] and Danielle [Caggiano] that he had no points. . . .

On 12/1/11, HR Rep Caggiano wrote:

     I look at Jesus' points and this would put him at 7 points.  I let Russ know that he should have him stay home and we will call him. . . .

On 12/1/11, Hr Mgr Mattos forwarded all of this and wrote to HR Mgr Anderson :

> I asked Russ to talk tomorrow - he told me yesterday that he told Jesus he must have gotten bad information. **I am concerned about a term so close to him returning from deployment.  What do you think?**

Disputed

54. Leprino produced a summary of all actions taken against Plaintiff from his personnel records which shows that he was terminated for missing work on 11/29/11.  Hr Mgr Anderson claimed, in deposition, that it was a mistake.

Disputed

55. VP / Gen Mgr Tuttrup even admitted that Plaintiff was suspended pending termination, and not put on admin leave.

Disputed

56. HR Mgr Mattos admitted, in deposition, that, after the termination, Plaintiff complained to her about Leprino refusing to remove attendance points that would have fallen off automatically had Plaintiff not taken military leave and remained continuously employed.

Disputed

57. HR Mgr Mattos admitted, in deposition, that Plaintiff complained to her, after being reinstated, about not being paid for a 12 hour shift that he was scheduled to work during his termination.  She did not correct this situation.

Disputed

58. VP / Gen Mgr Tuttrup admitted, in deposition, that he was aware of Plaintiff's complaint, after being reinstated, about not being paid for a 12 hour shift.  He did not do anything about it.

Disputed

59. HR Mgr Mattos admitted, in deposition, that Plaintiff complained about the policy relied upon in deciding that attendance points would not fall off automatically as they would have if he had not taken military leave and been continuously employed.

Disputed

60. HR Mgr Anderson admitted, in deposition, that Plaintiff complained to VP and Gen Mgr Tuttrup after he was reinstated and told that Leprino would not remove the attendance points that would have fallen off automatically had Plaintiff not taken military leave and remained continuously employed.

Disputed

61. HR Mgr Mattos admitted, in deposition, that Mgr Lucas sent her an email saying that Plaintiff complained to Lucas about not being paid for the 12 hour shift during the termination, and Lucas decided that he should not be paid.

Disputed

62. HR Mgr Anderson admitted that Plaintiff complained about being harshly disciplined on or about 5/31/12 for a no call/no show when he did in fact call in.

Disputed

63. Sr Supervisor Walker admitted, in deposition, that she knew Plaintiff was complaining about his attendance points.  These are the points that would have fallen off automatically had Plaintiff not taken military leave and remained continuously employed.  She was also aware of his complaint about pay following reinstatement.

Disputed

64. Sr Supervisor Walker admitted, in deposition,  that Plaintiff complained, during a meeting, with her and HR Rep McNabb about several things: (1) the discipline received since joining the

military; (2) he told them his son started getting sick in November 2011; (3)"unpaid administrative leave" after taking kin care; (4) VP / GM Tuttrup refusing to remove attendance points that would have fallen off automatically had Plaintiff not taken military leave and remained continuously employed; and (5) tension between him and Mgr Lucas.  HR Rep McNabb promised to look into these things, but never did.

     Disputed

65. Sup Huff admitted that he knew Plaintiff complained to HR and Plant Mgr Leitner about the adverse treatment.

     Disputed

66. HR Mgr Anderson admitted, in deposition, that Leprino has a military leave policy that states:

> **H. Effect of Military Leave on Family Medical Leave Act (FMLA)**
> Upon reemployment from military leave, the employee will be given credit for any months he or she would have been employed but for the military service in determining eligibility for FMLA leave; and the employee will be credited with the hours-of-service that would have been performed but for the period of military service in determining FMLA eligibility.

     Undisputed

67. Maya requested baby bonding leave after his son was born in May 2011, and while he was still on active duty.

     Disputed

68. HR Mgr Anderson admitted, in deposition, that, despite the written policy, Plaintiff's request for baby bonding leave was denied when he returned from an extended military leave in late 2011 because Leprino did not credit him with time worked for the duration of his military service.

     Disputed

69. HR Mgr Mattos admitted, in deposition, that the HR staff told Plaintiff that he had six points

1   after he was reinstated from termination.  These are points that would have fallen off automatically

2   had Plaintiff not taken military leave and remained continuously employed.

3       Disputed

4

5   70. Leprino disciplined Plaintiff twice in one day.  On May 31, 2012, he was given a 6th working

6   suspension warning based on attendance points that would have fallen off automatically had

7   Plaintiff not taken military leave and remained continuously employed.  Then, he was given an 8th

8   final written warning for the false allegation of no/call no show.  The discipline was based on

9   attendance points that would have fallen off automatically had Plaintiff not taken military leave

10  and remained continuously employed.

11      Disputed

12

13  71. Supervisor Castillo admitted, in deposition, that he talked with Plaintiff about becoming a

14  group leader and there was a plan in place for Plaintiff to become a group leader when he returned

15  from extended military leave.

16      Disputed

17

18  72. Plaintiff is no longer on the promotion track because of all the discipline he received after

19  returning from extended military leave, which was based on attendance points that would have

20  expired automatically had Plaintiff remained continuously employed and not taken military leave,

21  and the harsh disciplinary treatment.  Since then, Mgr Lucas has directed a hostile attitude, rude

22  body language, mean facial expressions and made the work environment tense for Plaintiff.  He

23  has told Plaintiff that his concern in the production line, and anything not focused on that is

24  viewed in a negative light.

25      Disputed

26

27  73. HR Mgr Anderson admitted, in deposition, that Plaintiff was disciplined with a working

28  suspension for and alleged "no call / no show" on 5/26/12 and assessed 2 attendance points.  The

1   summary of Plaintiff's absences with notes says: "Called in and left a voicemail on 5/26/12.  Did

2   not talk to Eric Huff or any other supervisor."

3       Disputed

4

5   74. Mgr Lucas and Sr Sup Walker and others who made discriminatory comments above

6   disciplined Plaintiff with a working suspension for an alleged "no call/no show" and gave him 2

7   attendance points. Walker lied and said Plaintiff did not call at all, even though the notes show that

8   Plaintiff called and left a message.  Walker also claimed that Plaintiff was required to speak with a

9   supervisor in person even though the written policy does not say that.  The first suspension

10  document was a 6th termination warning based on 5 attendance points, then Walker issued another

11  suspension document for the same incident that was an 8th termination warning based on 6

12  attendance points.  The 8th warning and 6 attendance points was the last step before termination.

13  Both documents included points that would have expired automatically if Plaintiff had remained

14  continuously employed and not taken military leave.

15      Disputed

16

17  75. A jury could infer that Sup Huff and others schemed to discipline Plaintiff more harshly

18  because Huff used an Attendance Report form.  It has a section when the employee is "Absent

19  from Shift" and a different section when the employee has an "Unreported Absence."  Huff first

20  filled out the "Absent from Shift" section and wrote: "Sick. Called and left message on phone."

21  Then signed his name.  He wrote that Maya left the message about 3 hours before the start of his

22  shift. At some point he wrote "VOID - Not This One" over that section and then filled in the

23  section for "Unreported Absence."  He wrote: "called and left voice mail.  Did not talk to me or

24  any other supervisor."

25      Disputed

26

27  76. A jury could infer that Sup Huff and others schemed to discipline Plaintiff more harshly

28  because Huff admitted in deposition that Plaintiff did not violate the no "call / no show" policy

and that he just "called in sick."  He specifically said that absences mentioned in the disciplinary document was not a "no call / no show situation."

    Disputed

77. Supervisor Huff admitted that Plaintiff did call in to notify him. Plaintiff called multiple times and left a voicemail message.  Huff received the voicemail from Plaintiff, but did nothing to call him back.  Huff admitted there was nothing preventing him from calling Plaintiff back.

    Disputed

78. Sr Supervisor Walker admitted, in deposition, that she did not even know if the company has communicated anything to employees about the alleged requirement to speak with a supervisor as opposed to leaving a message when calling in sick.

    Disputed

79. Sr Supervisor Walker admitted, in deposition, that employees are supposed to call the supervisors office number to call in sick.  She also admitted, however, that supervisors do not spend a lot of time in the office.  The supervisors have voice mail and employees have left messages for supervisors in the past.

    Disputed

80. Sr Supervisor Walker claimed, in deposition, that, as an alternative, employees can call the guard shack when they call in sick, and the guards will find the supervisor by radio.  However, Walker admitted that she is not sure if the phone number to the guard shack was distributed to employees and was not sure how employees were supposed to call the guard if they did not have the number.

    Disputed

81. Leprino's written attendance policy states:

**UNREPORTED ABSENCE POLICY:**
Because of the hardship created by these problems, discipline of suspension and/or termination may occur on the first offense. An unreported absence is defined as failure to notify employer within one (1) hour after an employees scheduled work starting time, with a reason acceptable to the employer. . . .
Each unreported absence occurrence will be assessed two (2) points.  If an employee does not contact the employer within twenty-four (24) hours of the scheduled starting time; the employee will be considered to have abandoned his/her job and his/her employment will be terminated.

Undisputed

82. Plaintiff testified, in deposition, that he had called in sick in the past and left messages with no problem.  Supervisors even called him back on occasion.  Other times he was able to get through to a supervisor when he called back.  On this occasion he called multiple times and did not reach a supervisor.

Disputed

83. HR Mgr Anderson admitted, in deposition, that Plaintiff complained to HR because he was disciplined for no/call no show and given 2 extra attendance points.  The matter was elevated to Anderson for a final decision.  Anderson told Plaintiff that the 2 additional points would stand because "we follow this [attendance] policy with exactness to preserve its integrity. . . . exception are not granted."

Disputed

84. HR Mgr Anderson first claimed, in deposition,  that the attendance policy required Plaintiff to actually speak with a supervisor as opposed to leaving a message, but he fumbled all over the place when shown the policy because it does not say that and he could not explain why he was imposing an unwritten rule on Plaintiff.

Disputed

85. HR Mgr Anderson admitted, in deposition, that, despite telling Plaintiff exceptions to the attendance policy are not granted, Anderson has discretion to make exceptions to the attendance

policy when assessing points, and he has done this in the past.  He also has responsibility to review alleged violations of the no call/no show policy to ensure there was in fact a violation of the policy before assessing points.

Disputed

86. HR Mgr Anderson admitted, in deposition, that, despite telling Plaintiff exceptions to the attendance policy are not granted, he made exceptions to the attendance policy for at least two employees so that they were not disciplined in accordance with the attendance policy.

Disputed

87. HR Mgr Anderson admitted, in deposition, that Plaintiff "was disciplined for not calling in on 5/26/12" even though he left a message.

Disputed

88. HR Mgr Anderson admitted, in deposition, that an employee commented, during a meeting about attendance polices, that Plaintiff was not be treated fairly.  Anderson chastised the employee for bringing that up during the meeting and threatened him with the policy prohibiting employees from spreading rumors.

Disputed

89. Supervisor Huff admitted that he tried to get Plaintiff in trouble by reporting him for an alleged "no call / no show" on 2/23/12.  Plaintiff had rescheduled some routine training with the permission of a supervisor. So the report was obviously not true.  Huff admitted he did not talk to anyone, including Plaintiff, he just initiated the disciplinary process.  The supervisors did not do this for others (George Austin, Mikey Dominguez, Anthony Munoz, Clemente Castillo and Kenny Owens) who missed training.

Disputed

90. Supervisor Huff admitted that he tried to get Plaintiff in trouble by reporting, in writing, that he "did not show up for training" on 4/15/12 without talking to Plaintiff or anyone else.  This was not true either.

     Disputed


91. Supervisor Huff has given Plaintiff a hard time by being rude unnecessarily and even harassed Plaintiff about work logs when he does not do this others (Danny Sands and Brad Benn).

     Disputed


92. HR Mgr Anderson admitted, in deposition, that Leprino disciplined Plaintiff for missing work on a day when he was approved for FMLA.  He tried to say that the discipline was reversed but the paperwork does not show that.  Plaintiff said he was not aware the point was reversed.

     Dsiputed


93. Supervisor Castillo admitted, in deposition, that he wrote an attendance report to discipline Plaintiff for not calling in on 8/1/12 even though Plaintiff had been approved to take a scheduled vacation day.  When asked why he did not just call Plaintiff to find out what happened, he said that one of the supervisors or managers on Line 3 (Mgr Lucas, Supervisor Walker, Huff, Wooten, Holliday, or Young) told him to write the disciplinary document.

     Disputed


94. HR Mgr Mattos admitted, in deposition, that Leprino's policy requires a supervisor to communicate with HR before denying any request for accommodation.

     Disputed


95. Sr Supervisor Walker admitted, in deposition, that she, as a supervisor, was supposed to refer an employee to HR if approached by employee about time off for a medical issue.  Specifically, if an employee asked for time off for a medical procedure, the supervisor is supposed to refer them

to HR.

Disputed

96. Plaintiff asked for time off to have a colonoscopy and to cleanse the day before by taking laxatives. Mgr Lucas and Sr Supervisor Walker denied his request for the day off to cleanse and forced Plaintiff to work that day without asking for any medical certificate or anything.

Disputed

97. Sr Supervisor Walker admitted, in deposition, that Plaintiff asked her and Mgr Lucas for a few days of medical leave to have a procedure and to take the preparatory laxative medication before the procedure. They denied the request, in part, and gave him only one day off for the procedure because Lucas needed him on the production floor and did not want to pay overtime for 12 hour shifts.

Disputed

98. HR Mgr Anderson admitted, in deposition, that he participated in the decision not to remove the attendance points in December 2011, and then, after receiving letters form Plaintiff's attorney, removed the attendance points that would have fallen off automatically had Plaintiff remained continuously employed and not taken military leave.

Disputed

99. VP / Gen Mgr Tuttrup admitted, in deposition, that Leprino first refused to remove the attendance points that would have fallen off automatically had Plaintiff remained continuously employed and not taken military leave by not accounting for the leave as "time worked service", but then "corrected the record with the point to reflect the service, the military service as is required by law.

Disputed

100. HR Mgr Anderson admitted, in deposition, that Plaintiff requested baby bonding leave when he returned from an extended military leave in late 2011, and that Leprino denied his request.  He admitted that Plaintiff's attorney contacted Leprino to "challenged what happened."

     Disputed

101. HR Mgr Anderson admitted, in deposition, that, after receiving letters from Plaintiff's attorney, he spoke with his boss and learned that he should treat military leave as hours worked for seniority based benefits.

     Disputed

102. HR Mgr Anderson admitted, in deposition, that, after Plaintiff's attorney contacted Leprino, he reviewed data pertaining to Plaintiff and determined that Plaintiff's attendance points should have fallen off automatically as if he had been continuously employed during the military leave and his request for baby bonding leave should have been approved.

     Disputed

103. HR Mgr Anderson admitted, in deposition, that, after Plaintiff's attorney contacted Leprino, he wrote a letter to Plaintiff dated August 30, 2012, stating that his request for baby bonding leave was wrongfully denied, because his military leave time should have been counted toward his eligibility.

     Disputed

104. HR Mgr Mattos admitted, in deposition, that she first learned that attendance points were supposed to drop off normally when employees took military leave in 2012, as opposed to freezing the 12 month drop off period while the employee is away.

     Disputed

105. HR Mgr Anderson admitted, in deposition, that offering Plaintiff baby bonding leave a year

1   later did not remedy the situation because there is no way to put Plaintiff back in the position that

2   he would have been in had his leave been handled correctly.  This is because Plaintiffs son was

3   already more than a year old and his second child was due to be born a few months later.

4       Disputed

5

6   106. VP / Gen Mgr Tuttrup admitted, in deposition, that Leprino denied Plaintiff's request for

7   baby bonding leave that should have been approved because he was on military leave.

8       Disputed

9

10  107. HR Mgr Anderson admitted, in deposition, that Leprino has no written policy pertaining to

11  how to handle request for military leave when employees have drill weekends.  He claimed that

12  the issue was covered by the LOA policy, but it is not.

13      Disputed

14

15  108. HR Mgr Anderson admitted, in deposition, that each department at Leprino handles requests

16  for military leave for drill weekends differently, but the department determines whether to cover

17  the absent employee with a relief person or ordering someone to work overtime.  However, when

18  the leave is not for an extended period, the employee could appear on the schedule to work when

19  he has to be at drill weekend and the department has to scramble to find coverage.  This made

20  other employees angry at Plaintiff who said this happened at least six times.

21      Disputed

22

23  109. Sr Supervisor Walker admitted, in deposition, that she has created problems for employees

24  needing time off for drill weekend by posting schedules that require them to work on drill

25  weekends even though they gave her copies of drill orders before the schedule was made.  This

26  made other employees angry at Plaintiff.

27      Disputed

28

110. Sr Supervisor Walker admitted, in deposition, that she has created problems by failing to enter Plaintiff's drill dates so that supervisors will know that he had drill and should not be at work. Supervisor Huff admitted that Walker scheduled Plaintiff to work on a day that he had drill and should not have done so.  This made other employees angry at Plaintiff.

    Disputed


111. HR Mgr Mattos claimed that Plaintiff was supposed to contact HR and fill out forms for extended military leave, but he only needed to contact his supervisor or manager about weekend drills.  Managers or supervisors are supposed to take care of scheduling and coverage for Plaintiff when he is absent.

    Disputed


112. HR Mgr Mattos admitted, in deposition, that the HR department created an Excel spreadsheet, in December 2011, listing Plaintiff's attendance points that should have fallen off automatically had Plaintiff not taken military leave and remained continuously employed. VP / GM Tuttrup told the HR department and managers to use the form as a new standard for calculating attendance points when employees take military leave even though it is wrong.

    Disputed


113. Sr Supervisor Walker admitted, in deposition, on May 29, 2013, many months after the lawsuit was filed, that she had never had any training about a prohibition of retaliation for taking military leave, did not know whether company policy prohibited such, or whether disciplining an employee for taking military leave would violate any company policy.

    Disputed


114. Sr Supervisor Walker admitted, in deposition, on May 29, 2013, many months after the lawsuit was filed, that she did not know if company policy prohibited her from making jokes about employees because they take military leave.

Disputed

115. Sr Supervisor Walker admitted, in deposition, on May 29, 2013, many months after the lawsuit was filed, that she did not know if company policy prohibited supervisors from saying employees on military leave drill weekends are on mini-vacations.

Disputed

116. Sr Supervisor Walker admitted, in deposition, on May 29, 2013, many months after the lawsuit was filed, that she did not know if company policy prohibited supervisors from saying emergency military drill weekends are ridiculous.

Disputed

117. Sr Supervisor Walker admitted, in deposition, on May 29, 2013, many months after the lawsuit was filed, that she did not know if company policy prohibited supervisors from saying it's not fair that other employees have to cover for someone who is away on military drill weekend.

Disputed

118. Supervisor Castillo admitted that he has never been counseled about the email exchanges above wherein supervisors complained about Plaintiff taking military leave.

Disputed

119. Leprino has not improved its handling of Plaintiff 's request for military leave.  In April 2012, he made a request, but Leprino sent him a letter saying he was approved for medical leave.

Disputed

120. Supervisor Huff admitted that he knew Plaintiff took medical leave.

Undisputed

121. HR Mgr Anderson admitted, in deposition, that he oversees all of the HR functions at the Lemoore-West facility, including personnel policies.  He is involved in updating those policies and makes recommendations about how to do so.  These policies apply to all employees at the facility.  He has authority to modify the Lemoore-West employee handbook, which is one of Leprino's personnel policies.  He also makes recommendations to the legal department about how it should be modified.

     Undisputed


122. HR Mgr Anderson admitted, in deposition, that approximately 950 employees work at the Lemoore-West facility.  This is about 25% of Leprino's entire work force of 4,000 employees.

     Disputed


123. VP / Gen Mgr Tuttrup admitted, in deposition, that he is responsible for the entire operation at Leprino's Lemoore-West facility.  He is responsible for the creation of company policies there. He is responsible for the creation of the budget there as well.  He has authority to review, modify and correct the budget if necessary.

     Undisputed


124. VP / Gen Mgr Tuttrup's attitude in deposition is indicative of the problems at Leprino regarding protected leaves.  He was asked, "Do you think it's okay for a supervisor or manager to be mean to an employee, because that employee has taken a protected leave?"  He was asked: "Is it okay for supervisors and managers to make jokes about employee who have taken a protected leave?"  He refused to answer both questions claiming he did not understand, and said this was his best answer to the questions.  VP Tuttrup refused to answer a very simple question: "If supervisors make jokes about employees who have taken protected leaves, the ones that we've talked about, would that violate the company policy?'  He said: "I don't know."  He became even more obstreperous when asked whether it was okay for supervisors to make jokes about employees that took military leave and to say being off all the time for drill weekends was ridiculous.

He was very cavalier in saying he did not know if the supervisors violated any company by

writing email messages mentioned above.  He refused to say whether he had a problem with the

supervisors making such comments.

Disputed

### IV. Analysis

### A. USERRA and Cal. Mil. & Vet. Code § 394

Plaintiff alleges discrimination and retaliation in violation of USERRA and Cal. Mil. &

Vet. Code § 394. Doc. 2, Complaint, 6:9-21 and 8:11-25.  The analysis of Cal. Mil. & Vet. Code §

394 claims appears to largely mirror that of USERRA claims. See Flores v. Von Kleist, 739 F.

Supp. 2d 1236, 1257-58 (E.D. Cal. 2010), citing Bursese v. PayPal, Inc., 2007 U.S. Dist. LEXIS

12785, *15-17 (N.D. Cal. Feb. 12, 2007).  The parties treat the two laws as interchangeable, so the

court will analyze the issue under USERRA, which states in relevant part:

> (a) A person who is a member of, applies to be a member of, performs, has
> performed, applies to perform, or has an obligation to perform service in a
> uniformed service shall not be denied initial employment, reemployment, retention
> in employment, promotion, or any benefit of employment by an employer on the
> basis of that membership, application for membership, performance of service,
> application for service, or obligation.
>
> (b) An employer may not discriminate in employment against or take any adverse
> employment action against any person because such person (1) has taken an action
> to enforce a protection afforded any person under this chapter [38 USCS §§ 4301 et
> seq.], (2) has testified or otherwise made a statement in or in connection with any
> proceeding under this chapter, (3) has assisted or otherwise participated in an
> investigation under this chapter [38 USCS §§ 4301 et seq.], or (4) has exercised a
> right provided for in this chapter [38 USCS §§ 4301 et seq.]. The prohibition in this
> subsection shall apply with respect to a person regardless of whether that person
> has performed service in the uniformed services.
>
> (c) An employer shall be considered to have engaged in actions prohibited -
>     (1) under subsection (a), if the person's membership, application for
> membership, service, application for service, or obligation for service in the
> uniformed services is a motivating factor in the employer's action, unless the
> employer can prove that the action would have been taken in the absence of such
> membership, application for membership, service, application for service, or
> obligation for service
>     (2) under subsection (b), if the person's (A) action to enforce a protection
> afforded any person under this chapter [38 USCS §§ 4301 et seq.], (B) testimony or
> making of a statement in or in connection with any proceeding under this chapter
> [38 USCS §§ 4301 et seq.], (C) assistance or other participation in an investigation
> under this chapter [38 USCS §§ 4301 et seq.], or (D) exercise of a right provided

1

2
for in this chapter [38 USCS §§ 4301 et seq.], is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right.

3
38 U.S.C. §4311.

4
      Subsections (a) and (b) are written to prohibit discrimination and retaliation, respectively.

5
Other sections of USERRA create more detailed rights to reemployment (Section 4312) and

6
retention in employment and benefits (Section 4316).  The Ninth Circuit has interpreted

7
subsection (b)(4)'s "exercised a right provided for in this chapter" language expansively, to cover

8
those other delineated rights. See Wallace v. City of San Diego, 460 F.3d 1181, 1189 (9th Cir.

9
2006) (considering a request for reemployment as an exercise of provided right for retaliation

10
analysis).  Thus, the distinction between discrimination and retaliation appears to be blurred in the

11
USERRA context.  Courts have found that the standards for USERRA discrimination and

12
retaliation to be the same. See Lisdahl v. Mayo Found., 633 F.3d 712, 721 (8th Cir. 2011).  As

13
Plaintiff alleges termination and denial of benefit, the analyses of discrimination and retaliation in

14
this case are joined into one.

15
      The framework for considering USERRA claims is similar to that of Title VII. See Tarin v.

16
County of Los Angeles, 123 F.3d 1259, 1267 n.7 (9th Cir. 1997) (applying the Title VII

17
framework to the Veterans Reemployment Rights Act, USERRA's predecessor).   USERRA "is

18
very similar to Title VII." Staub v. Proctor Hosp., 131 S. Ct. 1186, 1191 (2011).  "The individual

19
has the burden of proving that a status or activity protected by USERRA was one of the reasons

20
that the employer took action against him or her, in order to establish that the action was

21
discrimination or retaliation in violation of USERRA. If the individual succeeds in proving that

22
the status or activity protected by USERRA was one of the reasons the employer took action

23
against him or her, the employer has the burden to prove the affirmative defense that it would have

24
taken the action anyway." 20 C.F.R. §1002.22 (2013).  "[T]he employee first has the burden of

25
showing, by a preponderance of the evidence, that his or her protected status was a substantial or

26
motivating factor in the adverse employment action; the employer may then avoid liability only by

27
showing, as an affirmative defense, that the employer would have taken the same action without

28
regard to the employee's protected status." Leisek v. Brightwood Corp., 278 F.3d 895, 899 (9th

Cir. 2002), citations omitted.  Thus, for a claim under Section 4311, Plaintiff must demonstrate (1) an adverse employment action that (2) was motivated (at least in part) by Plaintiff's military status or Plaintiff's exercise of rights.

For this motion, Plaintiff alleges:

> A jury acting reasonably could infer, from the evidence, that Maya was terminated for one week, and then reinstated after he complained. A jury could infer that Maya was suspended without pay. They could infer that Maya was disciplined harshly when he was disciplined twice in the same day and given a final written warning based on a false allegation of no call/no show.  A jury could also infer that Maya's supervisors falsely reported him for multiple policy violations and denied his request for FMLA as part of a plan to get rid of Maya.

Doc. 16, 13:25-14:3.  Defendant argues that none of these allegations constitute an adverse employment action and that there is no evidence of impermissible motivation.  Defendant does not argue in the alternative that it would have taken the same action even if Plaintiff did not have protected status.

**1. Nature of the Dispute Between the Parties**

At base, this case arises from Defendant's mischaracterization of Plaintiff's military leave in determining his employment rights and benefits.  Plaintiff took extended military leave from October 2010 to August 2011.  Defendant uses a system of attendance points to determine when an employee's absences warrant ending their employment.  Points are added when an employee is tardy or absent; those points are subtracted twelve months later if the employee has worked regular hours in the intervening year. Doc. 16, Part 7, Ex. C, Mattos Deposition, 30:6-19.  If the number of points grows to seven, the employee is fired.

USERRA states

> a person who is absent from a position of employment by reason of service in the uniformed services shall be-- (A) deemed to be on furlough or leave of absence while performing such service; and (B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service

38 U.S.C. §4316(b)(1).  Defendant's policy is to freeze the attendance points of an employee that

takes a leave of absence; Defendant does not normally treat the leave as regular hours worked for subtracting attendance points twelve months after their accrual. Doc. 16, Part 7, Ex. C, Mattos Deposition, 32:15-17.  However, Defendant's policy is to treat military leave differently than other leaves of absences.  Specifically, "Employees will receive credited service and other seniority-based rights (and any other rights and benefits in accordance with USERRA) for the time spent on military leave, if he or she returns to work upon release from military duty within the time limitations and requirements of USERRA." Doc. 16, Part 8, DEF000429, Human Resources Military Leave Policy Effective January 1, 2009, page 3.  Defendant acknowledged that it should have counted Plaintiff's military leave time as regular hours worked for the purpose of calculating attendance points and when the points should be subtracted. Doc. 16, Part 9, Tuttrup Deposition, 29:14-23.  Defendant did not apply this exception to their attendance point rules until an unspecified time in 2012. Doc. 16, Part 7, Ex. C, Mattos Deposition, 32:19-33:17.  Looking at Plaintiff's employment records, documentation from May 31, 2012 shows that Defendant still counted two attendance points Plaintiff accrued in August 2010 as active instead of having dropped off in August 2011. Doc. 15, Part 5, Ex. A, Attendance Disciplinary Action Forms, DEF00069 and DEF00074, pages 56-57.  Through at least May 2012, Defendant did not treat Plaintiff's military leave as regular hours worked for the purpose of calculating attendance points. Anderson confirmed that changing Plaintiff's attendance points by treating military leave as regular hours worked was not a new policy but correcting prior improper implementation of existing policy. Doc. 16, Part 8, Ex. D, Anderson Deposition, 29:15-19.   For Plaintiff, this miscalculation caused problems in December 2011.  At that time, Plaintiff spoke to human resources and specifically asked about how leaves of absences interacted with attendance points. Doc. 16, Part 7, Ex. C, Mattos Deposition, 94:18-95-10; Doc. 16, Part 7, Ex. 71, DEF002001, December 14, 2011 e-mail.  Plaintiff was given incorrect information.

     Similarly, Defendant had a policy that did not treat leaves of absence as regular hours worked for determining when an employee could take family and medical leave.  Again, Defendant's policy was to exempt military leave from this rule: "Upon reemployment from military leave, the employee will be given credit for any months he or she would have been

1  employed but for the military service in determining eligibility for FMLA leave; and the employee

2  will be credited with the hours-of-service that would have been performed but for the period of

3  military service in determining FMLA eligibility." Doc. 16, Part 8, DEF000430, Human

4  Resources Military Leave Policy Effective January 1, 2009, page 4.  However, Defendant did not

5  apply this exemption to Plaintiff when he asked for baby bonding leave in April 2012.  Plaintiff

6  specifically asked how eligibility for family and medical leave was determined in the summer of

7  2012; he was told that he had insufficient regular hours worked in the prior twelve month period.

8  Doc. 16, Part 8, Ex. D, Anderson Deposition, 19:10-21:5.

9        Thus, the conflict between Plaintiff and Defendant giving rise to this case stems from

10  Defendant human resources department's failure to apply the special exception to military leave in

11  calculating attendance points and benefits.

12

13  **2. Adverse Employment Action**

14        In the USERRA context, an adverse employment action is an act "an objectively

15  reasonable employee would have found the challenged action 'materially adverse.' 'Materially

16  adverse' means the retaliatory act 'might have dissuaded a reasonable worker from making or

17  supporting a charge of discrimination.'" Lisdahl v. Mayo Found., 633 F.3d 712, 720 (8th Cir.

18  2011), quoting Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (applying

19  Title VII discrimination standard to USERRA retaliation claim); see also Crews v. City of Mt.

20  Vernon, 567 F.3d 860, 869 (7th Cir. 2009) (applying Title VII's "materially adverse" standard to

21  USERRA).  "[T]he adversity must be material—it is not enough that the alleged adverse conduct

22  poses some de minimis inconvenience." Wilson v. Murillo, 163 Cal. App. 4th 1124, 1136-37 (Cal.

23  App. 1st Dist. 2008) (discussing adverse action in public accommodations for disability context, a

24  lower threshhold than adverse employment action).  An adverse employment action is an act that

25  "materially affects the terms, conditions, or privileges of employment....Minor or relatively trivial

26  adverse actions or conduct by employers or fellow employees that, from an objective perspective,

27  are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as

28  materially affecting the terms, conditions, or privileges of employment and are not actionable."

Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1051 and 1054 (Cal. 2005).  "A materially

adverse change might be indicated by a termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices that might be unique to a particular

situation." Thomas v. Department of Corrections, 77 Cal. App. 4th 507, 511 (Cal. App. 4th Dist.

2000), quoting Crady v. Liberty Nat. Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993).

Examples of adverse employment action include "termination, demotion, or denial of an available

job." Zeinali v. Raytheon Co., 636 F.3d 544, 552 (9th Cir. 2011).


**a. Potential Termination Based on Attendance Points**

In December 2011, Plaintiff was sent home from work for approximately one week

because Defendant believed he had accumulated seven attendance points (without considering

Plaintiff's military leave as regular hours worked).  Plaintiff contends he was fired and then was

rehired when Defendant realized its mistake. Doc. 16, Opposition, 3:7-19.  Defendant contends

Plaintiff was put on administrative and then reinstated with pay. Doc. 15, Brief, 6:26-7:6.  The key

dispute appears to be whether Plaintiff was actually fired and whether he received any back pay

with reinstatement.

Neither party provides clear evidence regarding the events of December 2011.  Plaintiff

was asked about the incident in his deposition:

> Q. Now you said that Russ tried to make a termination stick in 2011; is that right?
> A. That is correct.
> Q. Now, you were not, in fact, terminated in 2011, were you?
> A. yes, I was.
> Q. Were you given a final paycheck?
> A. I was not.
> Q. Were you given a letter of termination?
> A. Not that I remember, no.
> Q. So you're still employed, correct.
> A. Correct.
> Q. So when you say you were terminated, what do you mean.
> A. They notified me that I had reached seven points by a call-in and that seven
> points equals termination. Russ then walked me through the plant, and we followed
> up with the HR department, and then I left.
> Q. And what happened after that?
> A. I received a phone call some days later from Russ saying that - to return.
> Q. How many days later?

A. Approximately a business week. It was for to six days.
Q. Were you paid for the time off?
A. Yes.

Doc. 16, Part 5, Ex. A, Maya Deposition, 188:10-189:10.  Human Resources Manager Kes

Anderson describe the confusion surrounding the calculation of Plaintiff's attendance points:

Q....You were aware that he was sent home and was not allowed to work when
there was a possibility that he would be terminated?
A. I'm not positive he was ever sent home.
Q. Okay. Well, was there some discussion about terminating him?
A. Yes.

Doc. 16, Part 8, Ex. D, Anderson Deposition, 45:19-25.  The manager of the plant agreed with the

characterization of the incident as "Mr. Maya was terminated and reinstated." Doc. 16, Part 11,

Ex. G, Leitner Deposition, 9:4-11.  This indicates that at the plant, there may have been a general

understanding that Plaintiff had been fired and then rehired.  Ana Mattos, another member of

Defendant's human resources department, said "He was told he was out on leave without pay,

pending further review." Doc. 16, Part 7, Ex. C, Mattos Deposition, 52:8-9.  When Plaintiff

returned there was some discussion about the work and pay he missed:

A. He had a question regarding eight hours or 12 hours.
Q. Of pay?
A. Yes.
Q. For the time that he was off?
A. Correct.
Q. Because he had been scheduled for a 12-hour shift during that time he was off?
A. Correct.
Q. And did you get an answer?
A. At that point, I didn't -- wasn't involved at that point. I think that was directly
handled with him.

Doc. 16, Part 7, Ex. C, Mattos Deposition, 55:13-25; Doc. 16, Part 7, DEF02001.

Taking all of the proffered evidence, there is some factually uncertainty as to whether

Plaintiff was actually fired as opposed to being put on administrative leave.  Defendant

acknowledges that any administrative leave was initially unpaid.  It was only after Defendant

determined that its own human resources department made the mistake that Defendant awarded

Plaintiff at least partial back pay and reinstatement, either rehiring him or bringing him back from

administrative leave.

If a threatened termination is not carried out, it does not constitute an adverse employment

40

1   action under FEHA. <u>Lewis v. UPS, Inc.</u>, 252 Fed. Appx. 806, 808 (9th Cir. 2007).  Defendant cites

2   to out of circuit authority for the proposition that "an employer's placement of an employee on

3   paid administrative leave pending the conclusion of an investigation" does not constitute an

4   adverse material action. <u>Nichols v. S. Ill. University-Edwardsville</u>, 510 F.3d 772, 786 (7th Cir.

5   2007), citing <u>Breaux v. City of Garland</u>, 205 F.3d 150, 157-58 (5th Cir. 2000), <u>Singletary v. Mo.

6   Dep't of Corr.</u>, 423 F.3d 886, 891-92 (8th Cir. 2005), and <u>Von Gunten v. Maryland</u>, 243 F.3d 858,

7   869 (4th Cir. 2001).  However, unpaid leave is considered differently: "While administrative

8   leave, by itself, may not constitute an adverse employment action, being placed on administrative

9   leave without pay does." <u>Johnson v. Alice Indep. Sch. Dist.</u>, 2012 U.S. Dist. LEXIS 131350, *9

10  (S.D. Tex. Sept. 14, 2012).  "[U]nder some circumstances, placement on administrative leave can

11  constitute an adverse employment action....Dahlia's assertions—that administrative leave

12  prevented him from taking the sergeant's exam, required him to forfeit on-call and holiday pay,

13  and prevented him from furthering his investigative experience—if proved, would constitute an

14  adverse employment action. The inability to take a promotional exam, loss of pay and

15  opportunities for investigative experience, as well as the general stigma resulting from placement

16  on administrative leave appear reasonably likely to deter employees from engaging in protected

17  activity." <u>Dahlia v. Rodriguez</u>, 2013 U.S. App. LEXIS 17489, *51 and *54 (9th Cir. Aug. 21,

18  2013), en banc, (employment retaliation for exercise of First Amendment rights in violation of 42

19  U.S.C. §1983).  In determining what constitutes an adverse employment action, the standard used

20  for Title VII claims is "the functional equivalent" of the standard for First Amendment claims.

21  <u>Coszalter v. City of Salem</u>, 320 F.3d 968, 976 (9th Cir. 2003).  An employer's affirmative action

22  to remedy a problem can eliminate what would otherwise be an adverse employment action. See

23  <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 930 (9th Cir. 2000) ("Brooks claims that the city

24  rescheduled her to an unfavorable shift and denied her vacation preference. However, like the

25  evaluation, these actions were not final. When Brooks complained, the city accommodated her

26  preferences by allowing her to switch shifts and vacation dates with other employees. The district

27  court did not err in rejecting Brooks's retaliation claim").  With respect to monetary benefits,

28  correction of a mistake and full recompense may be enough to satisfy USERRA. See <u>Conners v.</u>

1   Billerica Police Dep't, 679 F. Supp. 2d 218, 225 (D. Mass. 2010) ("Conners concedes that he has

2   by now been paid almost all of what he believes he is owed. He was, for example, listed on

3   'unpaid military leave' in January of 2005; the deducted personal, sick, and vacation time was

4   restored in 2007. He was also (eventually) compensated for any loss of base pay resulting from his

5   active duty assignments in 2007;" thus, plaintiff did not seek to base a USERRA claim on acts for

6   which he was already compensated).

7          In this case, the facts are not clear and the decision is close given the case law.  Plaintiff

8   believes he was fired and other employees at the plant colloquially agreed that he was fired and

9   rehired.  Considering the totality of the circumstances, a reasonable jury could find that Defendant

10  fired and then rehired Plaintiff, an action that is reasonably likely to deter Plaintiff from exercising

11  his right to engage in protected activity.  However, placing Plaintiff on administrative leave and

12  then shortly thereafter providing full back pay does not rise to the level of adverse employment

13  action.

14

15  **b. Denial of FMLA Leave**

16         Plaintiff made a request for FMLA leave in April 2012.  Defendant denied the request on

17  the basis that he had not worked sufficient hours in the preceding 12 months. Doc. 16, Part 8, Ex.

18  D, Anderson Deposition, 20:9-21:5.  Plaintiff's attorney contacted Defendant by letter in April

19  2012 asking for retention of records and again in July 2012 outlining the claims that constitute the

20  basis of this suit. Doc. 16, Part 8, Ex. D, Exs. 76 and 77.  Again, if Defendant had counted

21  Plaintiff's military leave as regular hours worked, the baby bonding leave would have been

22  granted for April 2012; instead Defendant offered to give Plaintiff the leave in August 2012 after

23  the threat of lawsuit. Doc. 16, Part 8, Ex. D, Anderson Deposition, 24:5-25:6 and 28:14-29:14.

24         Again, an employer's affirmative action to remedy a problem can eliminate what would

25  otherwise be an adverse employment action. See Brooks v. City of San Mateo, 229 F.3d 917, 930

26  (9th Cir. 2000).  However, if the remedy comes about only after significant effort by the employee

27  to correct the issue, the initial wrongful act remains an adverse employment action. See Fonseca v.

28  Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 848 (9th Cir. 2004) ("while the plaintiff in Brooks

made one complaint to remedy her adverse shifts, Fonseca filed five successful grievances. Because Fonseca was forced to file repeated grievances to remedy disparate treatment, he had to spend a significant amount of extra time simply to receive compensation to which he was clearly entitled"). Defendant did not offer a remedy until Plaintiff had hired an attorney and the company was threatened with suit. A reasonable jury could find Defendant's actions constituted an adverse employment action.

**3. Motivation**

Plaintiff was potentially fired and denied baby bonding leave because he took military leave and Defendant miscalculated his entitlement to benefits. "To be considered a motivating factor, a service member's military status need only be one of many factors the employer considers in reaching an employment decision." Ouimette v. County of L.A., 2012 U.S. Dist. LEXIS 176945, *14 (C.D. Cal. Dec. 12, 2012). In this case, Defendant clearly relied on the fact that Plaintiff took military leave in taking the above referenced actions. Defendant argues that there was no intent to discriminate and that the problems are the result of a mistake. Defendant points out that the Northern District of California has stated, "a mistaken interpretation of USERRA's statutory scheme does not establish discriminatory motive as a matter of law." Burgener v. Union Pac. Corp., 2009 U.S. Dist. LEXIS 33655, *30 (N.D. Cal. Apr. 22, 2009), citing Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 21 n.9 (1st Cir. 2007). However, the Burgener opinion deals with a denial of plaintiff employee's motion for summary judgment, a different procedural posture that the one at hand. The Northern District of California found that "it is conceivable Union Pacific attempted to delay the adjustment of Burgener's priority date, or that it adopted an incorrect priority date at least partly because of Burgener's military status," sending the issue of motivation to a jury. Burgener v. Union Pac. Corp., 2009 U.S. Dist. LEXIS 33655, *29 (N.D. Cal. Apr. 22, 2009). In Velazquez-Garcia, a plaintiff employee was fired for violating the defendant's code of conduct; the plaintiff argued that he was not given a copy of the code of conduct to which the First Circuit stated "Our concern here is not strictly the lack of notice that the check-cashing was in violation of the Code. That issue does not

1  arise in the USERRA analysis -- USERRA's concern is discrimination, not due process."

2  Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 21 n.9 (1st Cir. 2007).  Neither

3  Burgener nor Velazquez-Garcia state that a mistaken interpretation of law can never result in a

4  USERRA violation.  Admitted misinterpretation is not enough to definitively establish

5  discriminatory motive, but does not preclude that conclusion.  In this case, Defendant's continued

6  resistance to properly account for Plaintiff's military leave until approximately August 2012, even

7  after Defendant was put on notice that there was a problem in December 2011 may be evidence of

8  problematic motive.  A reasonable jury could find that Defendant was impermissibly motivated by

9  Plaintiff's military leave in taking action against him.

10

11  **B. Kin Care Leave**

12      Plaintiff's third cause of action is "Retaliation for Exercising Right to Kin Care Leave In

13  Violation of California Labor Code § 233." Doc. 2, Complaint, 9:9-11.  Specifically, "(a) Any

14  employer who provides sick leave for employees shall permit an employee to use in any calendar

15  year the employee's accrued and available sick leave entitlement, in an amount not less than the

16  sick leave that would be accrued during six months at the employee's then current rate of

17  entitlement, to attend to an illness of a child, parent, spouse, or domestic partner of the

18  employee....(c) No employer shall deny an employee the right to use sick leave or discharge,

19  threaten to discharge, demote, suspend, or in any manner discriminate against an employee for

20  using, or attempting to exercise the right to use, sick leave to attend to an illness of a child, parent,

21  spouse, or domestic partner of the employee." Cal. Lab. Code §233. Doc. 16, Opposition, 16:23-

22  25.  Plaintiff alleges "Defendant subjected Plaintiff to adverse treatment and action for using sick

23  leave to care for the illness of Plaintiff's child. Defendant further violated these sections by

24  counting, as part of its 'no fault' absence control policy, sick leave taken by Plaintiff to care for

25  the illness of her child as an absence that resulted in adverse action and treatment." Doc. 2,

26  Complaint, 9:21-25.  Plaintiff took some time off in November 2011 to take care of his sick son.

27  Doc. 16, Part 9, Ex. 86, DEF001261.  These absences may have contributed to the attendance

28  points that gave rise to the December 2011 termination/administrative leave.

The parties agreed as part of the joint statement of material facts that "7. Plaintiff was not provided 'kin care' leave when he did not have enough accrued sick leave to cover the absence." Doc. 15, Part 1, 2:11-12.  Plaintiff states "there is no dispute that supervisors knew Maya used his right to kin care. The same analysis relied upon for the USERRA retaliation, discrimination and harassment case applies here." Doc. 16, Opposition, 16:23-25.  Defendant argues "Plaintiff has never suffered a tangible adverse employment action in connection with the accumulation of attendance points. Accordingly, Plaintiff's claim under Labor Code section 233 fails as a matter of law." Doc. 15, Brief, 20:5-7.  Given the way the parties have framed the argument, the retaliation claim thus matches Plaintiff's USERRA claim based on potential termination.  As with that claim, the issues of motivation and the characterization of the December 2011 incident are questions for the jury.

**C. Family and Medical Leave**

Plaintiff's fourth cause of action (which is erroneously called the sixth cause of action in the complaint) is termed "Violation of Medical Leave Laws In Violation of 2 C.C.R. §7297.0 et seq." and Plaintiff alleges that, "Pursuant to California Administrative Code, Title 2, §7297.9, Defendant was required to give Plaintiff notice of his right to request leave under CFRA. However, Defendant never provided Plaintiff with such notice." Doc. 2, Complaint, 10:8-14. Defendant argues that the referenced regulations do not provide for a private cause of action. Doc. 15, Brief, 20:16-28.  In response, Plaintiff abandons the original cause of action and recharacterized the claim as one under Cal. Gov. Code §12945.2 which states generally "it shall be an unlawful employment practice for any employer...to refuse to grant a request by any employee with more than 12 months of service with the employer, and who has at least 1,250 hours of service with the employer during the previous 12-month period, to take up to a total of 12 workweeks in any 12-month period for family care and medical leave."  Plaintiff now claims the cause of action is based on the following: "The family care leave includes time off for baby bonding. Medical leave includes time off to have a colonoscopy. There is no dispute that Maya's requests for both were denied....A jury could easily infer that Maya requested leave and exercised

his right to leave under the law, and that his protected activity was a motivating factor for the actions mentioned above." Doc. 16, Opposition, 17:14-25.  Plaintiff articulates denial of leave and retaliation theories.  Defendant states "In the Fourth Cause of Action, Plaintiff does not plead a claim for violation of California Government Code section 12945.2, on which he relies in his opposition....Allowing Plaintiff to proceed with a substantive claim under Government Code section 12945.2 now would preclude Leprino from conducting an investigation and full discovery into Plaintiff's claims and would eviscerate this Court's deadlines for Plaintiff to amend his complaint and for the parties to complete discovery (both of which have long since passed." Doc. 17, Reply, 26:23-17:4.

Cal. Gov. Code §12945.2 is part of the California Family Rights Act.  In the general allegations section of the complaint, Plaintiff did state "After returning from active duty, supervisors and managers of Leprino Foods unlawfully denied Plaintiff's request for baby bonding leave to be with his newly born son and family medical leave to care for his wife....In January 2012, Defendant denied Plaintiff's request for medical leave to care for his sick son and to seek medical treatment for his own serious medical condition. In doing so, Leprino Foods violated the Family and Medical Leave Act (FMLA) and California Family Rights Act (CFRA)." Doc. 2, Complaint, 5:4-13.  Further, the joint scheduling report signed by both parties' counsel states "he requested leave from work to bond with his newborn child and Defendant denied his request....Plaintiff filed multiple causes of action under...California Government Code section 12940, *et seq*." Doc. 10, Joint Scheduling Report, 2:3-12.  "An addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend the complaint. A district court's denial of leave to amend is reviewed for an abuse of discretion, keeping in mind the strong policy in favor of allowing amendment, and considering four factors: bad faith, undue delay, prejudice to the opposing party, and the futility of amendment." Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994), citations omitted.

Defendant is granted summary adjudication on the medical leave law cause of action as articulated in the operative complaint.  However, Plaintiff my choose to file a motion for leave to amend with the Magistrate Judge.

**D. Wrongful Termination**

Plaintiff concedes his fifth cause of action, wrongful termination in violation of public policy. Doc. 16, Opposition, 17:26-27.  Summary adjudication on this claim is granted.

## V. Conclusion

Defendant's motion is GRANTED IN PART and DENIED IN PART as follows.

Summary adjudication of the USERRA and Cal. Mil. & Vet. Code § 394 causes of action are denied.  However, a period of administrative leave with full back pay does not constitute an adverse employment action as a matter of law.

Summary adjudication of the retaliation for exercising right to kin care leave cause of action is denied.

Summary adjudication is granted to Defendant on the medical leave law cause of action.

Summary adjudication is granted to Defendant on the wrongful termination cause of action.

The parties directed to contact the courtroom clerk of Magistrate Judge Gary Austin within twenty-one (21) days to set up a scheduling conference.

IT IS SO ORDERED.

Dated:   March 17, 2014     _____

                                                    SENIOR  DISTRICT  JUDGE